**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
WHEELING**

| | |
|---|---|
| **TAMMY L. SMITH,** | |
| **Plaintiff,** | |
| **v.** | **CIVIL ACTION NO.: 5:16-cv-00128 (JUDGE STAMP)** |
| **NANCY A. BERRYHILL, Acting Commissioner of Social Security[1],** | |
| **Defendant.** | |

## REPORT AND RECOMMENDATION

### I.   INTRODUCTION

On August 9, 2016, Plaintiff Tammy L. Smith ("Plaintiff"), by counsel Carter Zerbe and Kral E. Osterhout, Esq., filed a Complaint in this Court to obtain judicial review of the final decision of Defendant Carolyn W. Colvin, Acting Commissioner of Social Security ("Commissioner" or "Defendant"), pursuant to Section 205(g) of the Social Security Act, as amended, 42 U.S.C. § 405(g). (Compl., ECF No. 1).  On October 12, 2016, the Commissioner, by counsel Helen Campbell Altmeyer, Assistant United States Attorney, filed an answer and the administrative record of the proceedings.  (Answer, ECF No. 9; Admin. R., ECF No. 10). On November 14, 2016, and December 13, 2016, Plaintiff and the Commissioner filed their respective Motion for Judgment on the Pleadings and Motion for Summary Judgment.   (Pl.'s Mot. for J. Plead ("Pl.'s Mot."),

---

[1] After this suit was filed, but before this Order was entered, Nancy A. Berryhill replaced Carolyn W. Colvin as the Acting Commissioner of Social Security.  Accordingly, pursuant to Rule 25(d), Fed.R.Civ.P., and 42 U.S.C. § 405(g), Nancy A. Berryhill is substituted for Carolyn W. Colvin.

ECF No. 12; Def.'s Mot. for Summ. J. ("Def.'s Mot."), ECF No. 13).  Following review of the motions by the parties and the administrative record, the undersigned Magistrate Judge now issues this Report and Recommendation to the District Judge.

## II.  PROCEDURAL HISTORY

On May 14, 2012, Plaintiff protectively filed her first application under Title II of the Social Security Act for a period of disability and disability insurance benefits ("DIB") and under Title XVI of the Social Security Act for Supplemental Security Income ("SSI"), alleging disability that began on August 15, 2008. (R. 210-216).  This claim was initially denied on October 19, 2012, (R. 119) and denied again upon reconsideration on February 13, 2013 (R. 134).  On April 22, 2013, and April 23, 2013, Plaintiff filed a written request for a hearing (R. 147-50), which was held before United States Administrative Law Judge ("ALJ") Jeffrey P. La Vicka on September 11, 2014, and December 18, 2014, in Morgantown, West Virginia.  Plaintiff appeared by video conferencing from Wheeling, West Virginia. (R. 59-66, 67-107).  During the ALJ hearing, Plaintiff appeared and testified, as did Larry Ostrowski, an impartial vocational expert. (Id.). On January 12, 2015, the ALJ issued an unfavorable decision to Plaintiff, finding that she was not disabled within the meaning of the Social Security Act. (R. 14-58). On June 23, 2016, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner. (R. 1-5).

## III.  BACKGROUND

### A.   Personal History

Plaintiff was born on November 22, 1965, and was 43 years old at the time she filed her first SSI claim. (R. 210-16). She completed her GED. (R. 82). Plaintiff's prior

work experience included telemarketing, bartending, waitressing, and working as a cashier. (R. 83, 85, 86). She was not married at the time she filed her initial claim (R. 210-16) and was not married at the time of the administrative hearing. (R. 59-66, 67-107). She has three children, none of which are dependent on her. (R. 73). Plaintiff alleges disability based on her depression, anxiety, OCD, insomnia, mood disorder, chronic back pain, hypothyroidism, high blood pressure, mini brain strokes, memory loss, degenerated disc disease, herniated S1, L4, L5, spinal stenosis, sciatica, sickened ligamentum, and facet arthrosis. (R. 229).

**B.    Medical History**

### 1.  Medical History Pre-Dating Alleged Onset Date of August 15, 2008

On July 8, 2008, Plaintiff presented to the Ohio Valley Medical Center emergency department for evaluation, specifically seeking help, explaining she was addicted to drugs and alcohol, wanted to harm herself, and no longer wanted to live. (R. 293). Plaintiff denied having any injuries or trauma. Id. Medical notes indicated Plaintiff was going to be admitted to Hillcrest. Id. Her condition at discharge was fair and she was diagnosed with "acute polysubstance abuse" and "major depression with suicidal ideation." (R. 294).

On July 9, 2008, Plaintiff's mental examination revealed she had a cooperative attitude.  She admitted having insomnia and feeling depressed, hopeless and helpless. Plaintiff further admitted having difficulty relaxing and having "frequent death wishes and suicidal ideas." (R. 299). She was diagnosed with depression, opiate abuse, and alcohol dependence. (R. 300).  It was noted that Plaintiff would be admitted for detoxification, stabilization and treatment. Id.

3

On July 10, 2008, Plaintiff presented as a voluntary admission to Hillcrest with a "provisional diagnosis of depression . . . and polysubstance abuse"(R. 297), seeking psychiatric service." (R. 296).  Plaintiff complained of pain resulting from a procedure she had undergone for carpal tunnel.  Plaintiff admitted to taking additional pain medication and drinking alcohol to treat her pain, and complained of resulting depression.  Id.  Plaintiff felt depressed and anxious, but denied agitation, labile moods, or decreased energy. Id. She denied homicidal or suicidal thoughts and auditory and visual hallucinations. Generally, Plaintiff was well developed and well nourished. (R. 297).

From July 14, 2008 through July 17, 2008, while participating in therapy with the Hillcrest Group at the Ohio Valley Medical Center, Plaintiff reported she felt like she was doing much better. (R. 301).  She realized that using "chemicals are not worth it." Id. She was positive towards others and received positive comments from others, which helped improve her self-esteem.  Over the course of time she spent there, Plaintiff showed gradual improvement in her condition and uncomplicated detoxification.  Id.

### 2.  Medical History Post-Dating Alleged Onset Date of August 15, 2008

On September 2, 2008, Licensed Psychologist, Ronald L. Rielly, Ed.D., completed  medical necessity assessment (MNA) of Plaintiff, noting Plaintiff reported that her panic and anxiety attacks "are really bad." (R. 423). Plaintiff further reported that she had been admitted to Hillcrest for nine days. Id.  Plaintiff stated that she felt depressed and overwhelmed, but denied suicidal ideations, other than an occasional thought that things would be better off if she were not here. Id.  Plaintiff reported having trouble sleeping and feeling tired.  Dr. Rielly noted that all these symptoms related to

Plaintiff's depression.   Dr. Rielly, determined Plaintiff's level of functioning required minimal assistance in activities of daily living and maintaining adequate housing; but required substantial assistance with managing her finances, maintaining relationships, and self-administering medications. (R. 430). His final assessment noted Plaintiff's history of depressive and anxious symptoms as well as substance abuse issues. Plaintiff was referred for psychiatric services and individual therapy. (R. 431).

On September 9, 2008, Plaintiff returned to Northwood Health Systems for a psychiatric evaluation. (R. 435).   Plaintiff's chief complaint was having "trouble with alcohol." Id. Plaintiff stated that after she ran out of medications she relapsed to drinking alcohol. Id.   She also reported using marijuana and narcotics.   Id. Plaintiff reported experiencing staying awake for days and feeling restless and also feeling depressed years ago and as a result would sleep for days. However, she stated that in the more recent years, she did not have "these highs or ups for years."  (R. 436).  Plaintiff denied having symptoms of mania, hallucination or paranoia. Id.  Plaintiff also reported having a history of degenerative arthritis, back pain, and stiffness in her hands.   Id. Plaintiff's recommended treatment included getting "dried out" and a prescription for Prozac and Ambien. (R. 437).

On September 11, 2008, Plaintiff was seen by psychologist, M. Roberta Welling, MA, for depression. (R. 438).  Plaintiff's goal was not to be depressed anymore.  Id. Her objective goal was to identify triggers for depressive mood, and develop a therapeutic plan to deal with each trigger.   Id. Plaintiff showed some improvement towards goals. Id.

On October 8, 2008, Plaintiff was admitted to crisis stabilization after exhibiting signs of using drugs which have "produced a physical dependency as evidenced by clinically significant withdrawal symptoms." (R. 444, 477).  Plaintiff was ready for crisis stabilization services to be discontinued on October 14, 2008. (R. 460).

Plaintiff returned to Northwood Health Systems and was seen by Dr. Steve Corder. (R. 490). Plaintiff complained of having problems falling or staying asleep. Id. She also reported feeling depressed and anxious. Id.  Plaintiff denied having problems with medications. Id. Dr. Corder noted Plaintiff's struggle with addiction. Id. It was further noted that the result of Plaintiff's assessment showed there was no indication of being at an increased risk for danger to self or others. Id.

Plaintiff presented to Miller Chiropractor & Wellness Center from April 21, 2010, to July 2, 2010.  During the course of treatment Plaintiff complained of stiffness in her lower back and numbness down her legs. (R. 314-26).  Treatment consisted of spinal adjustments, modalities and heat and lumbar exercises.  Id. Treatment was performed without incident. Id.

Plaintiff reported to Wood Health Care Clinic, P.C., on a relatively monthly basis from February 2010 through November 2010, primarily for medication refills and follow up appointments on her anxiety and complaints of lower back pain. (R. 371-84). Plaintiff reported that pain was aggravated by sitting, standing, lifting, bending twisting, and lying down. (R. 371). Review of her body systems revealed no negative symptoms (R. 378-84). Physical exams revealed normal readings except for paraspinal muscle spasms in the lumbar region. Id.

On January 25, 2011, Plaintiff revisited Wood Health Care Clinic, P.C., for a physical examination and follow up on her anxiety and depression. (R. 369-70). Plaintiff complained of lower back pain and pain radiating down her right leg. (R. 369). Plaintiff further confirmed experiencing sore joints, lumbar pain, and numbness and tingling of arms or legs. (R. 369). Review of her body systems revealed positive symptoms for right shoulder pain.  Id.

On February 25, 2011, Plaintiff returned to Wood Health Care Clinic, P.C. complaining of left lower back pain, right shoulder pain and needing refills on her medication. (R. 365).  Review of her body systems revealed no negative symptoms. Id. Deltoid tenderness was noted in her right shoulder. Id.

On March 10, 2011, Plaintiff was seen by psychologist, Brenda L. Stevens for completion of a Medical Necessity Assessment. (R. 492-502).   Plaintiff reported having anxiety and depression. (R. 502). Plaintiff stated that she has difficulty tolerating social situations and is overcome by anxiety within a crowd. Id. It was determined Plaintiff had moderate impairment in social isolation and difficulty tolerating social situations without intense anxiety. Id. Plaintiff had moderate impairments with focusing and rambling thought processes.   She was easily distracted and reported short term memory problems.

On March 24, 2011, Plaintiff returned to Northwood Health Systems for a psychological evaluation conducted by Ronald L. Rielly, Ed.D. (R. 506-11). Dr. Rielly recommended Plaintiff receive psychiatric services to address mood symptoms pharmacologically, and individual therapy to deal with dysphoric mood and thought. (R. 511).

On April 7, 2011, Nurse Practitioner, Monica Smith, completed a psychiatric evaluation of Plaintiff, noting Plaintiff's complaints of anxiety, depression, insomnia, and "somatiform disorder". (R. 512).  Ms. Smith noted Plaintiff's history of incidents leading up to her current symptoms, including drug and alcohol abuse, three motor vehicle accidents, injuries she sustained after being thrown off of a horse, and criminal charges. Plaintiff stated she has not used alcohol since 2009. (R. 512). Plaintiff denied having thoughts of wanting to harm herself or others. (R. 513). Plaintiff was diagnosed with major depressive disorder, back problems, diverticulitis, ovarian cysts, and hypertension. (R. 514). Plaintiff was instructed to continue using Trazodone and to start using Vistaril and Zoloft. Id.

Plaintiff returned to Northwood Health Systems for ten visits between April 2011 and June 2012, complaining of anxiety, depression and sleeping problems.  (R. 515-550).  Plaintiff showed no indications of being at an increased risk for danger to herself or others during a couple of her visits, but during other visits indicated thoughts of killing herself. Id. She complained of feeling worthless, helpless and paranoid. (R. 539).

Between July 27, 2012, and October 23, 2014, Plaintiff revisited Northwood Health Systems routinely, primarily complaining of depression and anxiety. (R. 595-621, 655-759).  Plaintiff's goals were to reduce her anxiety and depressed moods.  Id. Progress towards the goals were varied from minimal to slow and steady. Id.  Problems with sleeping also fluctuated during that time period.  Id.  Psychotropic medications were prescribed. Id.

Plaintiff presented to Doctors Urgent Care on December 20, 2012, and January 5, 2013, primarily complaining of chronic back pain. (R. 575-81).  Review of her body

systems revealed no negative symptoms.  Radiological images presented no evidence of fracture or dislocation. (R. 583).  Disc spaces are maintained and sacrum was unremarkable. Id.

MRIs taken on January 22, 2013, showed "slight degenerative disc space narrowing" at L1-2 and "thickened ligamentum falvum/advanced facetal arthrosis" at L4-5.  However, no significant spinal canal stenosis or neural foraminal encroachment was noted. (R. 591).

On July 9, 2013, Plaintiff presented to Valley Pain Management and was seen by Roland F. Chalifoux, DO. (R. 648-51).  Plaintiff complained of low back, hip and S1 joint pain.  (R. 648) Radiographs showed "spondylolisthesis," which Dr. Chalifoux hypothesized may be one of the reasons why Plaintiff was experiencing pain. (R. 650).  Facet dysfunction was noted at L5-S1, which Dr. Chalifoux also thought may be contributing to Plaintiff's pain. (R. 650). A back brace and cortisone treatment were two of several recommendations. Id.

Plaintiff returned to Doctors Urgent Care on August 5, 2013, and November 14, 2013, complaining of pain. (R. 626-33).  During her November 14, 2013, visit, Plaintiff stated she had back and abdominal pain.  (R. 631). She also reported wheezing and asthma. Id. She denied experiencing memory loss or confusion, and further denied having excessive feelings of being nervous, anxious, feeling depressed or hopeless. She also indicated that she has had no insomnia.  (R. 631).

As a result of the lower extremity pain that Plaintiff was experiencing, Plaintiff underwent a noninvasive venous study on September 13, 2013. (R. 634). The results showed that all the examined veins were "patent, compressible, had spontaneous

phasic and augmented flow, without filling defect." Id.  Additionally, there were no signs of a "deep venous thrombosis" in either of Plaintiff's lower extremities. Id.

On October 24, 2013, Plaintiff reported to the Ohio Valley Medical Center emergency department, complaining of lower back pain. (R. 635).   Examination revealed "tenderness to palpation along the entire lumbar spine from about L3 to S1." Id. There was also tenderness around the S1 joint. Id. Plaintiff was given an IM injection of Dilaudid 1 mg and Percocet for the pain and discharged. Id.

Plaintiff presented to Dr. Edward Lynch's office on a monthly basis from March 2014 through October 2014, primarily complaining of lower back pain. (R. 770-802). Plaintiff explained that she had received epidural steroid injections from Dr. Chalifoux, which has caused her more pain. Id.   She further stated that she had seen a neurosurgeon, Dr. El-kadi, who recommended physical therapy and pain management. Dr. Lynch noted Plaintiff's spinal stenosis, herniated discs and facet syndrome. Id.   He further noted Plaintiff wears a back brace and left heel lift. Id. He noted Plaintiff believed her chronic back pain worsened in 2008 as a result of motor vehicle accidents and being thrown from a horse. Id. Review of body systems revealed normal readings except for a pinkish rash in lower lumbar area. Id.   Medications continued for treatment. Id.

Plaintiff presented to the Digestive Disease Center five times between September 4, 2013, and October 15, 2014, and was examined by Dr. Sanjay Chaudhry. (R. 805-20).  Plaintiff presented with abdominal pain, which was triggered by "stress anxiety" and alleviated by eating. (R. 805). Plaintiff also presented with dysphagia (difficulty with swallowing). It was determined that Plaintiff had "reflux, irritable bowel

syndrome, diverticuli and a history of endometriosis. (R. 807). Plaintiff was prescribed medication and given dietary advice.

### 3. Medical Reports/Opinions

On September 1, 2010, M. Aileen Mansuetto, M.A., a licensed psychologist, completed a consultative mental examination report on Plaintiff, noting Plaintiff's chief complaint was anxiety, panic attacks night terrors, degenerative disc disease, degenerative arthritis, a herniated disc in her back, and social anxiety. (R. 358-59). Plaintiff reported that she felt uncomfortable in groups, felt worthless and helpless "all the time." (R. 359).  Plaintiff was diagnosed with Generalized Anxiety Disorder, as she demonstrated that she is often "fretful, worried, and reports (but does not describe) severe panic episodes." (R. 362). Ms. Mansuetto, explained that Plaintiff's panic symptoms may have subsided as a result of the psychotropic medication she had been taking.  Id.   Plaintiff was also diagnosed with Alcohol Dependence and Personality Disorder. Id.

On October 3, 2012, Dr. Thomas Schmitt, completed a consultative examination report on Plaintiff.  (R. 552-60).  Plaintiff was examined on September 26, 2012.  Id. Review of her body systems revealed decreased muscle strength on a 4/5 scale in all muscle groups of the left leg. (R. 554).  Plaintiff's right calf measured 2cm larger than the left calf, demonstrating atrophy in the left calf.   Dr. Schmitt further noted that Plaintiff's heel and toe, squatting, and hopping movements are carried out with moderate difficulty.  Id.  Plaintiff's range of motion was noted to be "free and full with the exception of the lumbar spine," which was noted to be "severely compromised," resulting in a decreased range of motion. (R. 555)    "Sciatic notch tenderness was also

noted on the left spinal area. Id.    "[S]hort term memory loss and loss of normally familiar objects were also observed.  Id.

On October 9, 2012, Ms. M. Aileen Mansuetto, MA, a licensed psychologist, completed another consultative report on Plaintiff for services completed on September 18, 2012. (R. 561-68).    Plaintiff informed Ms. Mansuetto of the 2008 car accident she was involved in, and her experience of having a "brain stroke[]" which she attributes to impeding her ability to remember things. (R. 562).  Plaintiff reported attempting to commit suicide at age twenty-five, and relapsing with drinking alcohol three months prior to this examination. Id. She also reported being in constant pain, crying daily and often, having a low energy level and a poor appetite, and feeling hopeless, helpless and worthless. Id.

The WIAS-IV test was administered during this examination, and revealed Plaintiff had a verbal comprehension score of 80, perceptual reasoning score of 84, working memory score of 71, processing speed of 59 and full scale IQ score of 71. (R. 564).  Plaintiff was diagnosed with depression, anxiety, alcohol dependence, cannabis abuse and Generalized Anxiety Disorder.   Additionally, Plaintiff's memory screen showed impairment but the "COGNISTAT did not."  (R. 566).  Plaintiff's perception of herself and others was noted to be impaired and thought to affect her thinking, emotional responses, interpersonal functioning, and impulse control. (R. 566-67). Plaintiff is independent in all of her daily activities.

On October 18, 2012, state agency medical consultant, Thomas Lauderman, DO, completed a physical residual functional capacity (RFC) assessment of Plaintiff. (R.113-15). Dr. Lauderman found that, while Plaintiff possessed no manipulative, visual or

communicative limitations, Plaintiff did possess exertional, postural, and environmental limitations. Regarding Plaintiff's exertional limitations, Dr. Lauderman found Plaintiff able to: (1) occasionally lift and/or carry twenty pounds; (2) frequently lift and/or carry ten pounds; (3) stand and/or walk for approximately six hours in an eight-hour workday; (4) sit for approximately six hours in an eight-hour workday; and (5) push and/or pull with no limitations (R. 114). Turning to Plaintiff's postural limitations, Dr. Lauderman noted that Plaintiff can occasionally balance, stoop, kneel crouch, crawl and climb ramps, stairs, ladders, ropes, and scaffolds (R. 114). Finally, concerning Plaintiff's environmental limitations, Dr. Lauderman stated that Plaintiff must avoid moderate exposure to: vibration and hazards such as machinery and heights. (R. 115).  Dr. Lauderman, however, did note that Plaintiff need not avoid exposure to extreme heat, extreme cold, wetness, humidity, noise, fumes, odors, dusts, gases or poor ventilation (R.115).

On October 19, 2012, state agency medical consultant, James W. Bartee, Ph.D., completed a mental residual functional capacity (MRFC) assessment of Plaintiff. (R. 115-17).  Dr. Bartee found that across the functional and adaptive domains, Plaintiff had a number of mild to moderate limitations and one marked limitation. (R. 116).  However, Dr. Bartee concluded that the limitations do not meet a listing.  (117).

On February 12, 2013, state agency medical consultant, Uma Reddy, MD., completed a physical RFC assessment of Plaintiff. (R. 129).  Dr. Reddy found that, while Plaintiff possessed no manipulative, visual or communicative limitations, Plaintiff did possess exertional, postural, and environmental limitations. (R. 129-31). Regarding Plaintiff's exertional limitations, Dr. Reddy found Plaintiff able to: (1) occasionally lift

and/or carry twenty pounds; (2) frequently lift and/or carry ten pounds; (3) stand and/or walk for approximately six hours in an eight-hour workday; (4) sit for approximately six hours in an eight-hour workday; and (5) push and/or pull with no limitations. (R. 129). Turning to Plaintiff's postural limitations, Dr. Reddy noted that Plaintiff can occasionally balance, stoop, kneel crouch, crawl and climb ramps, stairs, ladders, ropes, and scaffolds. (R. 129). Finally, concerning Plaintiff's environmental limitations, Dr. Lauderman stated that Plaintiff must avoid moderate exposure to: vibration and hazards such as machinery and heights. (R. 130). Dr. Lauderman, however, did note that Plaintiff need not avoid exposure to extreme heat, extreme cold, wetness, humidity, noise, fumes, odors, dusts, gases or poor ventilation. (R. 130).

On February 12, 2013, state agency medical consultant, Jeff Harlow, Ph.D., completed a mental RFC assessment of Plaintiff. (R. 131-32). Dr. Harlow found that across the functional and adaptive domains, Plaintiff had a number of mild to moderate limitations. Id. However, Dr. Harlow concluded that although Plaintiff had functional deficits related to concentration and social functioning, Plaintiff's limitations are moderate at most and Plaintiff can perform repetitive one and two-step work like activities. Id.

## C.    Testimonial Evidence

Two ALJ hearings were held in this case. At the first hearing, held on September 11, 2014, Plaintiff did not have counsel and requested that the hearing be postponed so that she could obtain representation. (R. 59-66). The ALJ granted her request. Id.

At the ALJ hearing held on December 18, 2014, Plaintiff appeared by video without counsel, but proceeded with the hearing and divulged her relevant, personal,

work-related facts.  Plaintiff was born on November 22, 1965, and was forty-nine (49) years old at the time of the administrative hearing.  (R 71). She is 5'2" tall and weighs 127 pounds. (R. 73). She is not married, but lives with her fiancé. Id.  Plaintiff has three children at ages 30, 23, and 12. Id.

Plaintiff testified regarding her education and work-experience.  She stated that she received her GED and took a few vocational classes at the age of 18. (R. 82).  Her employment history includes working as a cashier, waitress, bartender and telemarketer. (R. 83-86).  She further testified that her fiancé's earnings and food stamps were current sources of income/assistance.  (R. 83).

Plaintiff testified that she suffers from several impairments, including social anxiety, carpal tunnel, and back pain.. (R. 88, 89, 91).  Plaintiff has undergone surgery for carpal tunnel, has had a colonoscopy, laparoscopy and tubal ligation.  (R. 89).  She is prescribed multiple medications to treat her high blood pressure, mood disorder, anxiety, stress, insomnia, and back pain, including Lisinopril, Neurontin, Buspar, Clonidine, Carafate, Pepcid, Bentyl, Xanax and Oxycodone. Plaintiff stated that Nuerontin caused her to have blurred vision and generally, some of the medications caused dry mouth and constipation. (R. 91).

After being asked about drug and alcohol use, Plaintiff testified that a year and half prior to the ALJ hearing she had tried cocaine and used marijuana.  (R. 93).  She further stated that she last drank alcohol in June 2014.  (R. 96).

Plaintiff also testified regarding her daily activities. She stated that she is able to clean and dress herself. (R. 97).  She goes grocery shopping once a month and cooks once a week, which entails making sandwiches or microwavable meals.  (R. 98).  She

does laundry, but relies on her fiancé to carry the clothes.  (R. 99). She does not vacuum, sweep floors, or wash dishes.  Lastly, Plaintiff stated that she had trouble remembering things and had difficulty sleeping. (R. 102).

### D.   Vocational Evidence

Also testifying at the hearing was Larry Ostrowski, a vocational expert (VE).  Mr. Ostrowski determined Plaintiff does not have any past relevant work, explaining Plaintiff has not had a full time job, or held jobs for short durations. (R. 103).

The ALJ then posed the following hypothetical to the VE:

> [A]ssume a hypothetical individual of the same age, education, and work experience as the claimant who retains the capacity to perform light work that allows to alternate sitting or standing positions for up to two minutes, at 30 minute intervals without going off task.  Assume there's no occasional posturals except no climbing of ladders, ropes, or scaffolds; is limited to no repetitive rotation, flexion or extension of the neck; is limited to occasional overhead reaching with the right upper extremity; is limited to frequent handling . . . handling and fingering, bilaterally; must avoid concentrated exposure to extreme cold and heat, concentrated exposure to wetness and humidity, all exposure to excessive vibration, concentrated exposure to irritants and chemicals.  This work site must be located within 100 feet of a restroom.  This work is limited to simple routine and repetitive tasks just –requiring only simple decisions with no fast paced production requirements and place changes; must have no interaction with the public and only occasional interaction with coworkers and supervisors.  Are there jobs in the regional or national economy that such an individual could perform?

(R. 103-04).  The VE testified that there would be the work of an office helper, mail clerk, and electrical accessories assembler. (R. 104). The VE further added that employers will permit an individual to be late, leave work early, or miss an entire day at least two times per month before receiving consequences regarding the incidents. (R. 105).

The ALJ then posed a question concerning the number of breaks a typical employer permits during the work day.   The VE responded stating that employers typically permit employees to take a fifteen minute break in the morning, fifteen minutes in the afternoon and thirty minutes for lunch. (R. 105). The VE further added that an individual can be off task up to ten percent of a work day. (R. 106).

The VE testified that his testimony was consistent with the Dictionary of Occupational Titles, with the exception of the sit/stand option posed in the hypothetical, explaining that "the sit/stand option is not defined in the Dictionary of Occupational Titles and related references," and further stating that his opinion regarding the sit/stand option and its effects on performing jobs is based upon his own personal experience or having performed job analyses.  (R. 106).

**E.    Work History Reports and Disability Reports**

On July 25, 2012, Plaintiff completed a work history report. (R 240-47).  In the report, Plaintiff indicated that she had worked as a waitress, clerk, bartender and telemarketer. (R. 240). As a waitress, Plaintiff cleaned, cooked and stocked items and dishes. (R. 241).  Plaintiff stated that the position required her to walk stand, sit, kneel, and crouch. (R. 242).  She further stated that the position required her to lift less than ten pounds, frequently. Id.

Plaintiff stated that while working as a clerk, she stocked cigarettes and worked as a cashier. (R. 242). That position did not require her to lift anything more than nine pounds. Id. This job required walking standing, sitting, climbing, kneeling, crouching, reaching and handling small objects. (R. 243).

While working as a bartender, she also waited tables.  (R. 243).  This position involved using the cash register and writing or completing reports. Id. She was required to walk, stand, sit, climb, stoop, kneel, crouch, reach and write, type or handle small objects. Id. The heaviest she was required to lift was twenty pounds, but less than ten pounds frequently. Id.

Lastly, Plaintiff indicated that while working as a telemarketer she was required to sit, and write, type or handle small objects. (R. 244).  The position did not require lifting or carrying. Id.

Plaintiff completed a Disability Report that was not dated. (R. 228-39).  She indicated that the medical conditions impacting her ability to work consisted of (1)depression , (2) anxiety, (3) OCD, (4) insomnia, (5) mood disorder, (6) chronic back pain (7) hypothyroidism, (8) high blood pressure, (9) mini brain strokes, (10 memory loss (11) degenerated disc disease (12) herniated S1, L4, L5, (13) spinal stenosis, (14) sciatica, (15) sickened ligamentum, and (16) facet arthrosis. (R. 229).

Plaintiff submitted a Disability Report–Appeal form that was not dated.  (R. 259-64).  On the form, Plaintiff reported a change in her condition. (R. 259).  Specifically, Plaintiff reported that her insomnia worked and that she could not stand more than fifteen minutes; thereafter she would experience numbness in her legs. (R. 259).  Plaintiff noted that she was referred to a neurosurgeon and pain management for evaluation and treatment. Id.   Plaintiff further indicated that she was having problems with digesting her food and that she had social anxiety (R. 262).

**F.      Lifestyle Evidence**

On an adult function report dated July 25, 2012, Plaintiff states that she is a recovering alcoholic and that she suffers from chronic back pain, anxiety, fear of people, memory loss, poor eyesight, insomnia, night terrors, PTSD, personality disorder, spinal stenosis, arthritis, and sciatica. (R. 248).   She describes her typical day to include waking up; drinking coffee; watching television; sitting on her porch for about ten minutes, twice a day; sometimes walking to the gas station; and doing housework. (R. 249).

Plaintiff explains how she is physically limited in some ways and not in others. Plaintiff performs her own personal care, but sometimes needs to be reminded to do so. R. 250). She also prepares her own meals, and does some household chores. (R. 250).

While Plaintiff is able to perform some activities, others prove more difficult.   For example, Plaintiff can no longer perform certain hobbies such as fishing. (R. 252). Moreover, she is unable to do all the cleaning that she used to do. Id.  She socializes with her daughter and "BF" (boyfriend). Id.   She is able to lift five pounds, squat and bend with support, sit for short periods of time, stand for ten to fifteen minutes, and reach to about eye-level. (R. 253).

As for her mental abilities, Plaintiff states that she is able to follow written and spoken instructions after they are repeated one or two times, she does not handle stress or changes in routine well.  (R 253).

On a second adult function report dated January 14, 2013, Plaintiff reported that she suffers from mental illness, anxiety, panic attacks, memory loss, poor concentration social disorder, OCD, PTSD, bipolar, insomnia and chronic pain. (R. 265). Depending

on how much pain she is experiencing, her typical day involves watching television, doing some light house work and light cooking, and feeding her pets. (R. 265).  She performs her own personal care, but at a slower pace. (R. 266).

Plaintiff explains she is able to prepare small meals within twenty minutes, three times a week. (R. 267). She is able to clean, fold clothes and water plants, but highlights that she could do more if she takes pain medication.  Id.

Plaintiff's hobbies include watching television, playing games, making jewelry, coloring with her daughter and sometimes reading.  She is no longer able to go fishing or ride horses. (R. 269). Plaintiff is able to sit or stand for fifteen minutes before her legs feel numb. (R. 270).

Regarding Plaintiff's mental abilities, she states at times she remembers things and at other times she does not, her mind wanders, and she has a short attention span. Id. Plaintiff reiterates that she does not handle stress or changes in her routine well. (R. 271).  Plaintiff also feels stigmatized after being accused of a crime.

## IV.    THE FIVE-STEP EVALUATION PROCESS

To be disabled under the Social Security Act, a claimant must meet the following criteria:

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work…'[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A) (2006). The Social Security Administration uses the following

five-step sequential evaluation process to determine if a claimant is disabled:

> (i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled.
>
> (ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.
>
> (iii) At the third step, we also consider the medical severity of your impairments(s). If you have an impairment(s) that meets or equals one of our listings . . . and meets the duration requirement, we will find that you are disabled.
>
> [Before the fourth step, the residual functioning capacity of the claimant is evaluated based "on all the relevant medical and other evidence in your case record . . ." 20 C.F.R. § 404.1520; § 416.920 (2011).]
>
> (iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled.
>
> (v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. § 404.1520; § 416.920 (2011). If the claimant is determined to be disabled or

not disabled at one of the five steps, the process does not proceed to the next step. Id.

## V.   ADMINISTRATIVE LAW JUDGE'S DECISION

Utilizing the five-step sequential evaluation process described above, the ALJ

made the following findings:

> 1.   The claimant has not engaged in substantial gainful activity since March 6, 2012, the application date (20 C.F.R. § 416.971 *et seq*).

2.      The claimant has the following severe impairments: lumbar degenerative disc disease osteoarthritis; migraines; gastroesophageal reflux disease (GERD); AC joint spurring of the right shoulder; irritable bowel syndrome; Major Depressive Disorder, recurrent moderate; Anxiety Disorder not otherwise specified; Personality Disorder and Substance Abuse/Dependence Disorder (20 C.F.R. § 416.920(c)).

3.      The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 416.920(d), 416.925 and 416.926).

4.      After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 C.F.R. § 404.967(b) except that she requires an allowance to alternate sitting or standing positions for up to two minutes, at 30 minute intervals, without going off-task. She should never climb ladders, ropes, or scaffolds.  The claimant should only occasionally climb ramps and stairs, balance, stoop, kneel, crouch or crawl.  She should not perform repetitive rotation, flexion, or extension of the neck.   She is limited to occasional overhead reaching wither right upper extremity.  The claimant is limited to frequent but not continuous handling of objects (gross manipulation) with both hands.  She is limited to frequent but not continuous fingering (fine manipulation) of items no smaller than the size of a paper clip with both hands.  The claimant should avoid concentrated exposure to cold, heat, wetness, humidity, chemicals and irritants such as fumes, odors, dust and poorly ventilated areas.   She should avoid all exposure to excessive vibration, unprotected heights, hazardous machinery and commercial driving. The claimant's worksite must be located within 100 feet of a restroom.  She is limited to performing simple, routine and repetitive tasks requiring only simple decisions, with no fast-paced production requirements and few workplace changes.  She should have only occasional interaction with co-workers and supervisors, and no interaction with the public.

5.      The claimant has no past relevant work (20 C.F.R. § 416.965).

6.      The claimant was born on November 22, 1965, and was 46 years old, which is defined as a younger individual age 18-49, on the date the application was filed (20 C.F.R. § 416.963).

7.      The claimant has at least a high school education and is able to communicate in English (20 C.F.R. § 416.964).

8.    Transferability of job skills is not an issue in this case because the claimant does not have past relevant work (20 C.F.R. § 416.968).

9.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 C.F.R. §§ 416.969 and 416.969(a)).

10.   The claimant has not been under a disability, as defined in the Social Security Act, since March 6, 2012, the date the application was filed (20 C.F.R. § 416.920(g)).

(R. 17-52).

# VI.   DISCUSSION

## A.   Standard of Review

In reviewing an administrative finding of no disability the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).  Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a jury verdict were the case before a jury, then there is 'substantial evidence.'" Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1968)). However, "it is not within the province of a reviewing court to determine the weight of the evidence, nor is it the court's function to substitute its judgment…if the decision is supported by substantial evidence." Hays, 907 F.2d at 1456 (citing Laws,

368 F.2d at 642; Snyder v. Ribicoff, 307 F.2d 518, 529 (4th Cir. 1962)). In reviewing the Commissioner's decision, the reviewing court must also consider whether the ALJ applied the proper standards of law: "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987).

**B.     Contention of the Parties**

Plaintiff, in her Motion for Summary Judgment, asserts that the Commissioner's decision "is arbitrary, contrary to law, and unsupported by substantial evidence." (Pl.'s Mot. at 2).  Specifically, Plaintiff alleges that:

1.  The ALJ failed to fulfill a heightened duty of care, by failing to conduct a full and fair inquiry and explore all the relevant facts of this case.

2.  The ALJ failed to evaluate whether Plaintiff's intellectual disability "equaled" the requirements of isting 12.05C.

3.  The ALJ failed to evaluate treating source evidence consistent with Agency policy and Fourth Circuit precedent.

(Pl.'s Br. in Supp. of Mot. for Summ. J. ("Pl.'s Br.") at [2, 3, 7], ECF No. 12-1).

Plaintiff asks the Court to enter judgment under sentence four of 42 U.S.C. § 405(g), reversing the Commissioner's final decision and remanding the case for further administrative proceedings. (Id. at 16).

Defendant, in her Motion for Summary Judgment, asserts that the decision "is supported by substantial evidence and should be affirmed as a matter of law." (Def.'s Mot. at [1]). Specifically, Defendant alleges that:

1.  The ALJ fulfilled his duty to Plaintiff at the hearing.

2.  Substantial evidence supports the ALJ's step three findings.

3.   Substantial evidence supports the ALJ's evaluation of the medical opinion evidence.

(Def.'s Br. in Supp. Of Def.'s Mot. for Summ. J. ("Def.'s Br.") at [4, 5, 9], ECF No. 14).

## C.   Analysis of the Administrative Law Judge's Decision

### 1.   The ALJ fulfilled his duty of care to Plaintiff during the administrative hearing.

Plaintiff first contends that the ALJ failed to fulfill his heightened duty of care to ensure Plaintiff had a "full and fair opportunity" to present her claim, by "scrupulously and conscientiously prob[ing] into, inquir[ing] of, and explor[ing] all the relevant facts," as Plaintiff appeared pro se during the administrative hearing.  Plaintiff asserts she was prejudiced by the ALJ's failure to evaluate her claim under Listing 12.05C.

Conversely, Defendant argues the ALJ fulfilled his duty to Plaintiff at the hearing highlighting that the ALJ questioned Plaintiff "about her family, her activities, and her medical conditions and treatment," thereby fulfilling his duty to Plaintiff.

Generally, Social Security administrative hearings are "informal rather than formal"[2] and "inquisitorial rather than adversarial."[3]   "[T]he conduct of the hearing rests generally in the examiner's discretion,"[4] and should be fair and "understandable to the layman claimant." [5]

Here, two hearings were held before the ALJ.  During the first hearing, Plaintiff appeared pro se and requested that the hearing be postponed so that she could obtain representation.  The ALJ granted her request, informing Plaintiff that she was permitted

---

[2] Richardson v. Perales, 402 U.S. 389, 400 (1971)
[3] Sims v. Apfel, 530 U.S. 103, 110–11 (2000). See also 20 CFR §404.900(b)(stating that the SSA "conduct[s] the administrative review process in an informal, non-adversarial manner.")
[4] Richardson, 402 U.S. at 400
[5] Id.

to one postponement, and another would not be granted absent extraordinary circumstances. (R. 64-65).  Plaintiff appeared to the second hearing without representation. Finding there were no extraordinary circumstances, the ALJ proceeded with the hearing.  The transcript reveals the ALJ questioned Plaintiff about her family, daily activities, medical conditions and medical treatment.  The transcript also reveals that the ALJ interrupted Plaintiff several times, advising Plaintiff to answer the questions he was actually asking, as he found she was frequently failing to do so.  Prior to the conclusion of the hearing, Plaintiff informed the ALJ that she did not understand any of the VE's testimony.  (R. 106).  When asked by the ALJ whether she had specific questions about what the VE said, or anything additional she wanted to share, Plaintiff informed the ALJ that she did not understand what the VE was talking about. (R. 106). Without further explanation, the ALJ concluded the hearing and informed Plaintiff she would receive his final decision in writing. (R. 107).  The hearing lasted approximately one hour and twenty minutes. (R. 69, 107)

While the transcript of the administrative hearing seems to indicate that the ALJ was discourteous, and not as patient or explanatory to Plaintiff, as previously stated, the ALJ inquired about the Plaintiff's family, daily activities, medical conditions, and medical treatment; and gave Plaintiff an opportunity to share anything additional. While he did not explain VE's testimony, failing to do so did not prejudice Plaintiff, as the ALJ's decision was fully comprehensive.  Accordingly, the undersigned finds that the ALJ conducted a fair and inquisitorial hearing. The undersigned also finds the record was adequately developed and that ALJ's opinion is supported by substantial evidence.

Plaintiff suggests the ALJ should have explored into whether her mental impairments satisfied Intellectual Disability Listing 12.05C, stating she was prejudiced by his failure to do so.  As explained more fully below, the undersigned disagrees.

### 2.   The ALJ's step three analysis is supported by substantial evidence.

Plaintiff asserts that her mental impairments satisfy Intellectual Disability Listing 12.05C, and that the ALJ erred by failing to evaluate whether her impairments satisfied the Listing, arguing Plaintiff has valid IQ testing, an additional and significant impairment, and deficits in adaptive functioning that were manifested prior to age twenty-two.

Defendant however, contends that substantial evidence supports the ALJ's step three findings, arguing Plaintiff "has not experienced significant deficits in adaptive functioning that manifested before age twenty-two.

The listings under the regulations, located at Appendix 1, Subpart P of Part 404, are "descriptions of various physical and mental illnesses and abnormalities, most of which are categorized by the body system they affect" with each impairment "defined in terms of several specific medical signs, symptoms, or laboratory test results." Sullivan v. Zebley, 493 U.S. 521, 529–30 (1990). Used as a regulatory device, the listings quicken the decision-making process to identify claimants whose impairments are so severe that they would be found disabled regardless of the vocational background. Id. at 532.

A claimant bears the burden of demonstrating that his impairment meets or medically equals a listed impairment. Kellough v. Heckler, 785 F.2d 1147, 1152 (4th Cir. 1986).  As the Supreme Court has stated:

> The Secretary explicitly has set the medical criteria defining the listed impairments at a higher level of severity than the statutory standard. The

listings define impairments that would prevent an adult, regardless of his age, education, or work experience, from performing any gainful activity, not just "substantial gainful activity." . . . The reason for this difference between the listings' level of severity and the statutory standard is that, for adults, the listings were designed to operate as a presumption of disability that makes further inquiry unnecessary. That is, if an adult is not actually working and his impairment matches or is equivalent to a listed impairment, he is presumed unable to work and is awarded benefits without a determination whether he actually can perform his own prior work or other work.

Zebley, 493 U.S. at 532 (internal citations omitted).

When evaluating whether a claimant meets one or more of the listed impairments, the ALJ must identify the relevant listings and then compare each of the listed criteria to the evidence of the claimant's symptoms. Cook v. Heckler, 783 F.2d 1168, 1173 (4th Cir. 1986). This analysis therefore "requires an ALJ to compare the plaintiff's actual symptoms to the requirements of any relevant listed impairment. Id. at 1173. To satisfy the requirements of a listing, the claimant "must have a medically determinable impairment(s) that satisfies all the criteria in the listing." 20 C.F.R. § 404.1525.

If a claimant's impairment(s) does not satisfy the criteria of a listing, there is a possibility that it can medically equal the criteria of a listing. Medical equivalence is determined in the following three ways:

1. If the claimant has an impairment that is described in the Listing of Impairments, but:
   a. The claimant's impairment does not exhibit one or more of the findings specified in the particular listing; or
   b. The claimant's impairment does exhibit all of the findings, but one or more of the findings is not as severe as specified in the particular listing; then
   c. We determine the claimant's impairment is medically equivalent to that listing if they have other findings related to their

impairment that are at least of equal medical significance to the required criteria.

2. If the claimant has an impairment that is not described in the Listing of Impairments, we will compare their findings with those for closely analogous listed impairments. If the findings related to the claimant's impairment are at least of equal medical significance to those of a listed impairment, we determine their impairment is medically equivalent to the most closely analogous listing.

3. If the claimant has a combination of impairments, none of which meets a listing, we will compare their findings with those for closely analogous listed impairments. If the findings related to the claimant's impairments are at least of equal medical significance to those of a listed impairment, we determine the combination of impairments is medically equivalent to the most closely analogous listing.

Program Operations Manual System (POMS) DI 24505.015 Finding Disability Based on the Listing of Impairments *Finding Disability Based on the Listing of Impairments*; See also 20 C.F.R. § 404.1527(b).

As Plaintiff suggests, her mental impairments (major depressive disorder, anxiety disorder and personality disorder) are not specifically described in Appendix 1 and argues that her medical findings should be have been compared with the intellectual disability listing of 12.05C.  However, as our sister court in the District of Maryland stated, "[n]either the Social Security law nor logic commands an ALJ to discuss all or any of the listed impairments without some significant indication in the record that the claimant suffers from that impairment."  Ketcher v. Apfel, 68 F. Supp. 2d 629, 645 (D. Md. 1999).  "Under Cook, the duty of identification of relevant listed impairments and comparison of symptoms to Listing criteria is only triggered if there is ample evidence in the record to support a determination that the claimant's impairment meets or equals one of the listed impairments." Id. See also Russell v. Chater, 60 F.3d 824, 1995 WL 417576, *3 (4th Cir.1995) (stating "Cook however does not establish an inflexible rule

requiring an exhaustive point-by-point discussion in all cases.").  The undersigned finds that the record does not support such a determination.

### a. Listing 12.05C

In order to be found disabled under Listing 12.05C, Plaintiff must satisfy three prongs: (1) she must have "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; *i.e.*, the evidence demonstrates or supports onset of the impairment before age 22;"  (2) she has "a valid verbal, performance, or full scale IQ of 60 through 70;"  and (3) she has "a physical or other mental impairment imposing an additional and significant work-related limitation of function." 20 C.F.R. Part 404, Subpart. P, Appendix 1, § 12.05.

Here, the ALJ's opinion evidences Plaintiff does not have deficits in adaptive functioning. Deficits in adaptive functioning generally encompass a broad range of cognitive and behavioral traits, and can "include limitations in areas such as communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety." Jackson v. Astrue, 467 Fed.Appx. 214, 218 (4th Cir. 2012).

After consideration of all the evidence, the ALJ concluded Plaintiff is moderately restricted in her daily activities and noted the following regarding Plaintiff's self-care and home living skills.   Plaintiff stated that she had no problem with caring for her personal needs, she was able to shower and dress herself, she had no problem caring for her pets, she prepared meals for herself, and she did laundry. (R. 22). Regarding Plaintiff's social skills, the ALJ concluded that Plaintiff was moderately limited in social functioning, noting Plaintiff indicated that although she had social anxiety she "got along

'okay' with family, neighbors and her fiancé's friends.   The ALJ further noted that in Plaintiff's January 2013 Functional Report, Aileen Mansuetto, M.A., found Plaintiff's social functioning was normal. (R. 22). Regarding community resources, the ALJ noted that Plaintiff was able to pay bills, count change, handle a savings account and use a checkbook.  (R. 23). The Plaintiff also stated that she uses public transportation.  (R. 22).   Regarding leisure activities, the ALJ further noted that Plaintiff stated that she watches television every day, plays games, makes jewelry, colors with her daughter, and reads sometimes. Lastly, regarding self-direction, Plaintiff shopped, cooked, helped her daughter and used transportation.

A review of the record also shows that Plaintiff has an IQ of 71, a score clearly outside the threshold requirement for a listed impairment under 12.05C.[6]  As previously stated, Plaintiff must satisfy all three prongs of Listing 12.05C to be considered disabled under that listing.  Here, Plaintiff has failed to satisfy two out of the three requirements. As such, the undersigned finds that it is clear the ALJ's decision contains the conclusion that Plaintiff does not meet Listing 12.05C and the ALJ's analysis provides substantial evidence to sustain that conclusion.

---

[6] Plaintiff's results from the Wechsler Adult Intelligence Scale, Fourth Edition, (WAIS-IV) test, revealed a Verbal Comprehension score of 80, a Perceptual Reasoning score of 84, a Working Memory score of 71, a Processing Speed score of 59, and a Full Scale IQ score of 71.  Plaintiff suggests that the IQ requirement of Listing 12.05C is satisfied suggesting Plaintiff's score of 59 on the Processing Speed Index satisfies the requirement.  However, Plaintiff fails to cite any evidence or case law to support that assertion.  The WAIS-IV is different from its predecessor, WAIS-III and has eliminated some IQ scores (Verbal IQ and Performance IQ), and "factor scores" have been renamed to "index scores."  Tracy W. Olivier, WAIS-IV Index and Full Scale Intelligence Quotient Score Differences between Standard and Prorated Scoring Methods, Archives of Assessment Psychology, Vol. 3. No.1, 57, 58 (2013), http://www.assessmentpsychologyboard.org/journal/index.php/AAP/article/view/52.  Plaintiff has failed to explain if and how an index score of 59 would satisfy Prong 2 of Listing 12.05C, requiring a valid verbal, performance, or full scale IQ of 60 through 70. Because Plaintiff received a Full Scale IQ score of 71, the undersigned finds that that Prong 2 is not satisfied.

### 3. The ALJ properly evaluated the medical opinions of therapist, Peter Smith, and certified Nurse Practitioner, Jill Emery.

Plaintiff contends that the ALJ failed to properly evaluate the medical opinions of Plaintiff's therapist, Peter Smith, and certified Nurse Practitioner, Jill Emery, arguing the ALJ's evaluation of Mr. Smith's opinion was legally insufficient, and further arguing that the ALJ failed to give well supported reasons in his RFC assessment for not including all the limitations Ms. Emery expressed in her opinion. (ECF 12-1 at 7).

Conversely, Defendant asserts that substantial evidence supports the ALJ's evaluation of the medical opinion evidence, arguing that the ALJ did not err when he concluded the medical opinions of Mr. Smith and Ms. Emery did not warrant controlling weight under the regulations, explaining their opinions were inconsistent with other evidence in the record. (ECF No. 14 at 9, 10).

Therapists and nurse practitioners are medical sources who do not fall within the Social Security Administration's list of "acceptable medical sources", but falls within the criteria of "other sources." See Section 404.1513(a), 404.1513(d) and 416.913. The Social Security Administration has drawn a distinction between "acceptable medical sources and medical providers who are not "acceptable medical sources," noting the following: (1) "acceptable medical sources" provide evidence concerning a claimant's impairments; SSR 06-03p (citing 20 C.F.R., §§ 404.153(a) and 416.913(a); see also 20 C.F.R. § 404.1502); (2) only statements from "acceptable medical sources" are deemed medical opinions; Id. (citing 20 C.F.R. §§ 1527(a)(2) and 416.927(a)(2)); and (3) "only 'acceptable medical sources' can be considered treating sources, as defined in 20 C.F.R. §§ 404.1502 and 416.902, whose medical opinions may be entitled to controlling weight." Id. (citing 20 C.F.R. §§ 404.1527(d) and 416.927(d).  However, opinions from

medical providers who are not "acceptable medical sources", including therapists and nurse practitioners, should be used to evaluate the severity of a claimant's impairments and how it affects the claimant's ability to function. (SSR 06-03p).  While the regulations do not explicitly address how evidence from "other sources" should be evaluated, "they do require consideration of such evidence when evaluating an 'acceptable medical source's' opinion. Id.

When considering opinion evidence of medical providers who are not "acceptable medical sources," the factors in 20 C.F.R. §§ 404.1527(d) and 416.927(d) can be applied. (SSR 06-03p). Yet, not every factor for weighing opinion evidence will apply in every case. Id. Moreover, "the fact that a medical opinion is from an "acceptable medical source" is a factor that may justify giving that opinion greater weight than an opinion from a medical source who is not an acceptable medical source." Id.  However, under certain circumstances, the opinions of medical providers that are not "acceptable medical sources" may outweigh the opinions of "acceptable medical sources," including a treating source. Id. This is appropriate when the "non-acceptable medical source" has (1) seen the claimant more often, (2) has greater knowledge of the individual's functioning over time, and (3) the non-acceptable medical source's" opinion has better supporting evidence and is more consistent with the evidence as a whole. Id.

While the Social Security Administration has made a distinction between what an ALJ must consider and what the ALJ must explain in the disability decision, generally, when the opinions of medical providers who are not "acceptable medical sources have a potential effect on the outcome of the case, the ALJ should explain the weight given to

those opinions, or otherwise ensure that the ALJ's discussion of the evidence in the decision allows the claimant or reviewing court to follow the ALJ's reasoning. Id.

Here, concerning Mr. Smith, Plaintiff acknowledges he is a medical provider that is not an "acceptable medical source" under the regulations, but contends that because he is Plaintiff's treating source, his opinion should have been given more weight than the non-treating sources.  The undersigned disagrees, because Mr. Smith is not an "acceptable medical source," under the regulations he cannot be deemed a treating source whose medical opinions may be entitled to controlling weight. However, his opinion can be considered along with other relevant evidence in the file when evaluating the severity of Plaintiff's impairments and their functional effects on Plaintiff.  It is without question that the ALJ considered Mr. Smith's opinion, and while the ALJ did not explicitly assign weight to Mr. Smith's opinion, he specifically stated that "Mr. Smith did not give any opinion regarding [Plaintiff's] functional abilities other than to state she had difficulty with general functioning." (R. 48).  It is clear Mr. Smith's opinion was of such a general nature, that it did not warrant a shift in the ALJ's decision regardless of a specific assignment of weight.  Mr. Smith's opinion did not include any explanation on what Plaintiff can do despite her impairments, or discuss Plaintiff's physical or mental restrictions.  Instead Mr. Smith shared his observations and gave general impressions of Plaintiff's difficulty with functioning "at times."  The ALJ acknowledged that Plaintiff has limitations related to her mental impairments, but concluded she is capable of working within the established RFC. Because the ALJ considered Mr. Smith's opinion and Mr. Smith failed to give an opinion regarding Plaintiff's functional abilities, the

undersigned finds Plaintiff was not prejudiced because Mr. Smith's opinion was not explicitly assigned weight or given more weight than the other medical providers.

Turning to Ms. Emery, Plaintiff asserts that the ALJ erred when he failed to provide sufficient reasons to support his refusal to include in his RFC finding, the five pound lifting limitation Ms. Emery determined Plaintiff had.  Like Mr. Smith, Ms. Emery is not an "acceptable medical source." The ALJ noted this fact yet went on to say that Ms. Emery's "opinion appears to be generally consistent with the objective medical signs and findings," noting Ms. Emery did not indicate that the claimant had any limitations on her ability to sit, stand or walk.  (R. 29).

While the regulations require an ALJ to *consider* all of the relevant medical evidence submitted by a claimant, contrary to Plaintiff's argument, the ALJ is not required to list out every single factor in his analysis when evaluating medical opinions. See e.g., McKenzie v. Colvin, No. 2:14cv52, 2015 WL 3442084, at *24 (N.D. W. Va. May 28, 2015).   An ALJ's decision need only "contain a statement of the case, in understandable language, setting forth a discussion of the evidence, and stating [his or her] determination and the reason or reasons upon which it is based." Reid v. Comm'r of Soc. Sec., 769 F.3d 861, 865 (4th Cir. 2014). In other words, an ALJ need only "provide a minimal level of analysis that enables [a] reviewing court[ ] to track the ALJ's reasoning." McIntire v. Colvin, No. 3:13-CV-143, 2015 WL 401007, at *5 (N.D. W. Va. Jan. 28, 2015).

In the present case, the undersigned finds that the ALJ considered Ms. Emery's opinion and did not err in not adopting her five pound lifting limitation. Although he acknowledged that her opinion was "generally consistent with the objective medical

signs and findings," (R. 29) it was within his discretion not to adopt the lifting limitation assessment. The ALJ stated he considered Plaintiff's complete medical history, as well as the opinions of the State Agency medical consultants that examined Plaintiff at the initial and reconsideration levels, as well as other acceptable medical sources. (R. 17, 50). The ALJ gave great weight to the opinions of the State Agency medical consultants, who found Plaintiff could lift twenty pounds occasionally and ten pounds frequently, explaining "these opinions are reasonable and well supported by the objective medical signs and findings." (R. 50).

The undersigned finds that the ALJ sufficiently discussed the relevant medical evidence and his reasons for determining Plaintiff's RFC, by providing a detailed and thorough discussion of the evidence over the course of several pages. (R. 24-50). Hence, the undersigned finds that the ALJ conducted a thorough review of Plaintiff's entire medical record throughout the opinion and found that it supported his RFC determination (R. 17–52).  Accordingly, the undersigned finds that substantial evidence supports the ALJ's evaluation of the medical opinions.

## VII.   RECOMMENDATION

For the reasons herein stated, I find that the Commissioner's decision denying the Plaintiff's application for Disability Insurance Benefits and Supplemental Security Income is supported by substantial evidence. Accordingly, I **RECOMMEND** that Plaintiff's Motion for Summary Judgment (ECF No. 12) be **DENIED**, Defendant's Motion for Summary Judgment (ECF No. 13) be **GRANTED**, and the decision of the Commissioner be affirmed and this case be **DISMISSED WITH PREJUDICE**.

Any party may, within fourteen (14) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objections are made, and the basis for such objections. A copy of such objections should also be submitted to the Honorable Frederick P. Stamp, Jr., United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); Thomas v. Arn, 474 U.S. 140 (1985).

The Court directs the Clerk of the Court to provide a copy of this Report and Recommendation to all counsel of record, as provided in the Administrative Procedures for Electronic Case Filing in the United States District Court for the Northern District of West Virginia.

Respectfully submitted this July 25, 2017

MICHAEL JOHN ALOI
UNITED STATES MAGISTRATE JUDGE